[No. 35608-2-II.   Division Two.   March 11, 2008.]

STOREDAHL PROPERTIES, LLC, *Appellant*, v. CLARK COUNTY, *Respondent*.

*Scott M. Edwards* (of *Perkins Coie, LLP*), for appellant.

*Arthur D. Curtis, Prosecuting Attorney,* and *E. Bronson Potter, Deputy,* for respondent.

¶1 BRIDGEWATER, J. — Storedahl Properties, LLC, appeals the Cowlitz County Superior Court's grant of summary judgment in favor of Clark County. We hold that Clark County's clean water charge is a regulatory fee as opposed to an unconstitutional tax. We affirm.

## FACTS

¶2 The Environmental Protection Agency identifies storm water runoff as "the most significant source of water pollution today." Clerk's Papers (CP) at 864. Storm water runoff occurs when precipitation from rain or snowmelt flows over the ground. "Impervious surfaces" are hard surfaces such as driveways, sidewalks, and streets that either prevent or retard the entry of water into the soil. Impervious surfaces significantly increase the volume and velocity of runoff and the amount of pollutants in storm water. In fact, water quality begins to decline when impervious surfaces cover just 10 percent of a watershed.

¶3 Under the Clean Water Act of 1977 (CWA), 33 U.S.C. §§ 1251-1387, any municipality with more than 100,000 residents, according to the 1990 census, is required to obtain a National Pollutant Discharge Elimination System (NPDES) permit. *Waste Action Project v. Clark County*, 45 F. Supp. 2d 1049 (W.D. Wash. 1999). The permit is intended to protect waters for use by wildlife and the public by controlling the adverse impact of storm water runoff and pollutants. Clark County (County) has a population of over 100,000 people within its unincorporated area. Accordingly, the CWA required the County to have a NPDES storm water permit. In *Waste Action*, 45 F. Supp. 2d at 1049, the district court granted summary judgment, finding that the County was required to obtain a NPDES permit. The district court entered a consent decree with the County that required it to adopt storm water regulations, conduct additional storm water facility maintenance, and engage in additional storm water regulation enforcement. On July 16, 1999, the Washington State Department of Ecology issued a NPDES permit to the County and, as a condition of the

permit, required it to undertake the activities described in the County's storm water management program (SWMP).

¶4 The County's SWMP required that it undertake several activities: monitoring groundwater quality, controlling storm water runoff from development, reducing pollutants exiting from developments, operating and maintaining storm water facilities, adopting ordinances relating to storm water discharge, reducing the discharge of pollutants from pesticides and fertilizers, preventing illicit discharges into the county storm water system, reducing discharges of pollutants from industrial facilities, and providing education programs aimed at activities that would impact storm water quality. The NPDES permit required the County to develop a funding strategy to support and maintain the required activities.

¶5 The County undertook a number of legislative actions to satisfy the requirements for its NPDES permit. It adopted Clark County Code (CCC) chapter 13.26A to prohibit discharge of pollutants into surface waters or groundwaters. It adopted Ordinance 2000-07-32A, which amended its regulations for runoff on the County's wetlands. In addition, the County adopted Ordinance 1999-11-09, which amended its storm water fee ordinances.

¶6 The County was already engaged in many of the activities required by the NPDES permit. Its SWMP refers to the existing activities (pre-NPDES permit) as "current activities." CP at 634. The SWMP refers to new and increased levels of activities as "additional activities." CP at 634. The County funds all current activities with its general fund and road fund tax revenues. To fund the additional activities, the County adopted the Clean Water Charge (CWC) with rates varying according to the services furnished, the benefits received, and the character, use, and storm water runoff characteristics of the land. CCC 13.30A.010.[1]

---

[1] CCC 13.30A.010 states:

The board of county commissioners finds and declares that existing storm water runoff conditions within the unincorporated areas of Clark County

¶7 The CWC applies to all properties in unincorporated Clark County valued at over $10,000 with impervious surfaces. The County's SWMP has five major program elements: (1) operation and maintenance, (2) regulatory, (3) capital improvement, (4) monitoring and evaluation, and (5) public involvement and education. CP at 684. The additional activities the County uses the CWC to fund include (1) an increase in street sweeping to prevent sediment, litter, and vegetation from entering the drainage system; (2) an increase in mowing biofiltration swales; (3) an increase in inspecting its catch basins annually and cleaning them as needed to maintain hydraulic capacity and prevent sediment from overflowing into the drainage system; (4) restarting a clean water educational program for children; (5) amending the building code to adopt current design standards for development and redevelopment projects to ensure that they comply with the storm water requirements; (6) educating the public about reducing and managing toxic materials; and (7) adding two code enforcement inspectors, one to improve erosion control compliance for new development projects, and the other to improve erosion control on building projects. The County places any remaining CWC funds in the capital facilities fund. CCC 13.30A.070.[2]

---

constitute a potential hazard to the health, safety and welfare of the lives and property of inhabitants. . . . The county has funded and undertaken storm water related activities described in the SWMP as "current activities" without a storm and surface water service charge in the unincorporated areas of the county. Implementing the regulations and additional proposed activities identified in the SWMP shall provide regulation of and protection from storm water runoff in the unincorporated areas of the county. To fund this work, it is necessary to adopt service charges in the unincorporated area of the county with rates varying according to the services furnished, the benefits received; and the character, use and storm water runoff characteristics of the land.

[2] CCC 13.30A.070 states:

The service charges collected pursuant to this chapter shall be used to fund the additional activities undertaken by Clark County as required by its NPDES permit. Any revenues collected in excess of the cost of such activities and fines collected for the violation of storm water regulations shall be set aside into a capital facilities fund maintained by the county treasurer. The moneys set

¶8 Storedahl owns property in unincorporated Clark County that it uses as a sand and gravel mine and processing facility known as Daybreak Mine. The County attempted to collect the CWC from Storedahl because Daybreak Mine contains impervious surfaces. Storedahl paid $8,655.24 for the CWC in the year 2000 and paid an additional $16,211.11 into the Clark County Superior Court registry for charges, late fees, and interest for the years 2001-2003.

¶9 Storedahl moved for declaratory judgment, challenging the CWC as an invalid property tax masquerading as a regulatory fee. The parties filed cross motions for summary judgment and the trial court granted the motion in favor of the County.[3]

## ANALYSIS

¶10 Storedahl contends that under the factors set out in *Covell v. City of Seattle*, 127 Wn.2d 874, 879, 905 P.2d 324 (1995), the CWC is an unlawful property tax rather than a regulatory fee. This court reviews a trial court's grant of summary judgment de novo. *Puget Sound Fin., LLC v. Unisearch, Inc.*, 146 Wn.2d 428, 433, 47 P.3d 940 (2002); *Marquis v. City of Spokane*, 130 Wn.2d 97, 104-05, 922 P.2d 43 (1996). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

---

aside into the capital facilities fund and earnings thereon shall be used only for the acquisition and construction of storm water facilities.

[3] We note that Storedahl's complaint and summary judgment motion challenged the CWC "as [it] applied to Storedahl." CP at 1. But the content of Storedahl's summary judgment motion reveals that it was challenging the CWC as an unlawful tax on property. The County argued below that Storedahl could not challenge a tax "as applied" to an individual property. CP at 144. At the motion hearing on October 20, 2006, Scott Edwards, counsel for Storedahl, acknowledged that the documents stated a claim "as applied to Storedahl," but he assured the trial court that its claim was actually that chapter 13.30A CCC was an unconstitutional tax on its face. Report of Proceedings (RP) at 3-4. At several points during the hearing, counsel for the County noted that Storedahl's contentions seemed to pertain to an "as applied" analysis, but the trial court was careful to clarify that it was considering the claim as a facial challenge. RP at 36.

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). The party seeking summary judgment bears the burden of establishing its right to judgment as a matter of law, and we must consider the facts and reasonable inferences from the facts in favor of the nonmoving party. *Swanson v. Liquid Air Corp.*, 118 Wn.2d 512, 518, 826 P.2d 664 (1992).

¶11 We review issues pertaining to constitutional limitations and statutory authority de novo. *Our Lady of Lourdes Hosp. v. Franklin County*, 120 Wn.2d 439, 443, 842 P.2d 956 (1993). We attempt to interpret ordinances in a manner that upholds their constitutionality. *City of Tacoma v. Luvene*, 118 Wn.2d 826, 841, 827 P.2d 1374 (1992).

¶12 "A local government does not have the power to impose taxes without statutory or constitutional authority." *Okeson v. City of Seattle*, 150 Wn.2d 540, 551, 78 P.3d 1279 (2003). The uniformity requirement of Washington Constitution article VII, section 1 provides that "[a]ll taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax . . . . All real estate shall constitute one class . . . ."

¶13 In contrast, charges imposed for purposes other than raising money to fund the public treasury, such as for regulating activities, are not taxes and are not subject to constitutional taxation constraints. *Samis Land Co. v. City of Soap Lake*, 143 Wn.2d 798, 805, 23 P.3d 477 (2001); *Dean v. Lehman*, 143 Wn.2d 12, 25, 18 P.3d 523 (2001). Where a charge relates to a direct benefit or service, this court generally does not consider it a tax or assessment. *King County Fire Prot. Dist. No. 16 v. Hous. Auth.*, 123 Wn.2d 819, 833, 872 P.2d 516 (1994). Instead, this court refers to such charges as "regulatory fees," a rather broad category that can "include a wide assortment of utility customer fees, utility connection fees, garbage collection fees, local storm water facility fees, user fees, permit fees, parking fees, registration fees, filing fees, and license fees." *Samis*, 143 Wn.2d at 805.

¶14 A local government can impose a fee under its general police power. WASH. CONST. art. XI, § 11; *Covell*, 127 Wn.2d at 878. But because of the different restrictions for imposing taxes versus imposing fees, there is "an inherent danger that legislative bodies might circumvent constitutional constraints . . . by levying charges that, while officially labeled 'regulatory fees,' in fact possess all the basic attributes of a tax." *Samis*, 143 Wn.2d at 805. "A city could then avoid the constitutional limitations on taxes by simply charging its citizens a 'fire department fee' or a 'police fee.'" *Okeson*, 150 Wn.2d at 552.

¶15 As a threshold matter, the County asks this court to consider, before engaging in a *Covell* analysis, whether *Teter v. Clark County*, 104 Wn.2d 227, 228, 704 P.2d 1171 (1985), is dispositive on the issue. The *Teter* court addressed whether an earlier version of the fee at issue here was unconstitutional where the landowner's property did not receive any "special benefit" from the water management activities. *Teter*, 104 Wn.2d at 228. We note that the *Teter* court engaged in a sua sponte analysis of whether the *Teter* charge was a fee or a tax. *Teter*, 104 Wn.2d at 238-39. The *Teter* court acknowledged that it was considering the tax question as a point of clarification and that the parties did not argue the question.

¶16 Storedahl argues that this discussion is mere dicta, while the County argues the discussion is dispositive in its favor. Storedahl correctly contends that the *Teter* court engaged in a sua sponte analysis of whether the *Teter* charge was a fee or a tax. *Teter*, 104 Wn.2d at 238-39. The *Teter* court acknowledged that it was considering the tax question as a point of clarification and that the parties did not argue the question. "In considering such statements made in the course of judicial reasoning, one must remember that general expressions in every opinion are to be confined to the facts then before the court and are to be limited in their relation to the case then decided and to the points actually involved." *Peterson v. Hagan*, 56 Wn.2d 48, 53, 351 P.2d 127 (1960). Nevertheless, the following year,

our Supreme Court cited to this alleged dicta in its discussion of the tax versus fee question in *Hillis Homes, Inc. v. Public Utility District No. 1 of Snohomish County*, 105 Wn.2d 288, 299, 714 P.2d 1163 (1986).

> In *Teter* . . . , we recently reiterated the distinction between fees and taxes:
>
> . . . .
>
> In *Teter*, the [city and county] imposed charges upon property owners to finance flood control operations provided by a newly created water department. We noted that the charges were collected only to pay for necessary regulatory actions (such as runoff control ordinances, erosion control ordinances, and septic tank regulations) and were therefore fees rather than taxes.

*Hillis Homes*, 105 Wn.2d at 299. Regardless of whether the language was dicta, the test applied by the *Teter* court mirrors the first prong of the *Covell* test we discuss below. As such, we find that *Teter* alone is not dispositive on this issue and we apply the *Covell* test.

## I. COVELL FACTORS

¶17 Washington courts consistently apply three widely recognized factors originally set forth in *Covell* to decide whether a charge is a regulatory fee or a tax: (1) whether the primary purpose is to raise revenue (tax) or to regulate (regulatory fee), (2) whether the money collected must be allocated only to the authorized regulatory purpose, and (3) whether there is a direct relationship between the fee charged and the service received by those who pay the fee or between the fee charged and the burden produced by the fee payer. *City of Lakewood v. Pierce County*, 106 Wn. App. 63, 75, 23 P.3d 1 (2001).

### A. FIRST FACTOR

¶18 Storedahl argues that the County failed to satisfy the first prong of the *Covell* test because the CWC is

nothing more than a means for it to raise revenue to fund general public improvements. The first factor is whether the primary purpose of the county is to accomplish desired public benefits that cost money or whether the primary purpose is to pay for a regulatory scheme, a particular benefit conferred, or mitigation of the burden created. *Arborwood Idaho, LLC v. City of Kennewick*, 151 Wn.2d 359, 371, 89 P.3d 217 (2004). Storedahl claims that *Samis* and *Covell* are dispositive in its favor. Br. of Appellant at 10. Both the *Samis* and *Covell* courts held that their respective municipal charges were taxes because the language of the ordinance was " 'devoted to fiscal planning rather than toward the type of service or benefit for those who pay fees.' " *Samis*, 143 Wn.2d at 807 (quoting *Covell*, 127 Wn.2d at 880).

¶19 *Covell* involved the question of whether a city's residential street utility charge was a regulatory fee or an unconstitutional property tax. *Covell*, 127 Wn.2d at 876. Citing *Teter*, 104 Wn.2d at 228, the city argued that its charge was a fee. The *Teter* court addressed whether a charge to finance a water management department was unconstitutional where the landowner's property did not receive any "special benefit" from the water management activities, ultimately finding it to be a valid regulatory charge as opposed to a tax. *Teter*, 104 Wn.2d at 228, 234. The *Teter* court stated, "[I]mprovements necessary to health and safety may be authorized under the police power and paid for 'other than by local assessments'." *Teter*, 104 Wn.2d at 231 (quoting *Morse v. Wise*, 37 Wn.2d 806, 813, 226 P.2d 214 (1951)). Further, it noted that the police power was broad enough to encompass all laws tending to promote the health, peace, morals, education, good order, and welfare of the people so long as the law reasonably tended to correct some evil or promoted some state interest. *Teter*, 104 Wn.2d at 233.

¶20 The *Covell* court distinguished its circumstances from those in *Teter* by noting that the street utility charge at issue in *Covell* did not provide any references as to how

street utility charges would enhance the health, safety, or welfare of the residents and that the primary purpose was to accomplish desired public benefits that cost money. *Covell*, 127 Wn.2d at 882-83.

¶21 Here, the CWC provides that existing storm water runoff conditions within the unincorporated areas of Clark County constitute a potential hazard to the health, safety, and welfare of the lives and property of inhabitants. CCC 13.30A.010. The CWC limits use of the funds for the purpose of paying all or any part of the cost and expense of regulating, monitoring, and evaluating storm water impacts; maintaining and operating storm water control facilities; educating the public on issues related to storm water; and paying all or any part of the cost and expense of planning, designing, establishing, acquiring, developing, constructing, and improving any such facilities; or paying or securing the payment of all or any portion of any issue of general obligation or revenue bonds issued for such purpose. CCC 13.30A.100. Based solely on the language of the ordinance, the County's CWC more closely resembles the fee from *Teter* than the tax from *Covell*.

¶22 The *Samis* court addressed whether a city's "standby charge," imposed on vacant, unimproved, uninhabited lots that abut but are unconnected to its water and sewer lines, was a regulatory fee or a property tax. *Samis*, 143 Wn.2d at 801. The *Samis* court began its analysis by studying the language of the ordinance and determined that the thrust of the ordinance was clearly on funding. *Samis*, 143 Wn.2d at 807. But the *Samis* court also noted that the fact the challenged ordinances dealt exclusively with fiscal matters did not conclude their inquiry because under *Hillis Homes*, 105 Wn.2d at 300, courts can look to " 'overall plan[s]' " of regulation in construing the purpose of a challenged fee. *Samis*, 143 Wn.2d at 809.

¶23 Storedahl contends that the thrust of chapter 13.30A CCC is clearly on funding. In addition, it claims that the overall plan of the CWC is simply to generate revenue for desired public programs because CCC 13.30A.070 pro-

vides, " 'charges collected pursuant to this chapter shall be used to fund the additional activities undertaken by Clark County as required by its NPDES permit.' " Br. of Appellant at 10 (quoting CCC 13.30A.070).

¶24 In response to Storedahl's contention, the County argues that whether a charge raises revenue is not dispositive on whether it is a tax or a fee because both taxes and regulatory fees raise revenue. *See Okeson*, 150 Wn.2d at 552. Rather, the County argues that, under *Samis*, the important consideration is the purpose for which the money is raised, because a tax raises revenue for the general public welfare, while a regulatory fee raises money to pay for or regulate the service that those who pay will enjoy or to pay for or regulate the burden those who pay have created. *See Samis*, 143 Wn.2d at 806. Specifically, the County relies on CCC 13.30A.010, .100, and .070. CCC 13.30A.010 provides:

> The board of county commissioners finds and declares that existing storm water runoff conditions within the unincorporated areas of Clark County constitute a potential hazard to the health, safety and welfare of the lives and property of inhabitants. . . . In order to effectively regulate and control storm and surface waters within unincorporated Clark County, an ordinance must be implemented under Chapter 36.89 RCW, and Article 11, Section 11 of the Washington State Constitution, to provide the financing and governance necessary for control and regulation of required storm water activities. The State of Washington Department of Ecology issued Clark County a National Pollutant Discharge Elimination System (NPDES) and State Waste Discharge permit. Under the terms and conditions of the permit, Clark County is required to fund and undertake a large number of activities. These activities are described in the Storm water Management Program ("SWMP") dated September 30, 1998, which was approved as revised by the Department of Ecology. The county has funded and undertaken storm water related activities described in the SWMP as "current activities" without a storm and surface water service charge in the unincorporated areas of the county. Implementing the regulations and additional proposed activities identified in the SWMP shall provide regulation of and protection from storm water runoff in the unincorporated areas of the

county. To fund this work, it is necessary to adopt service charges in the unincorporated area of the county with rates varying according to the services furnished, the benefits received; and the character, use and storm water runoff characteristics of the land.

¶25 The County contends that this section clearly refers to the overall regulation plan that the CWC implements and, in addition, limits use of the CWC funds to those activities provided in the SWMP.

¶26 CCC 13.30A.070 provides:

The service charges collected pursuant to this chapter shall be used to fund the additional activities undertaken by Clark County as required by its NPDES permit. Any revenues collected in excess of the cost of such activities and fines collected for the violation of storm water regulations shall be set aside into a capital facilities fund maintained by the county treasurer. The moneys set aside into the capital facilities fund and earnings thereon shall be used only for the acquisition and construction of storm water facilities.

¶27 The County contends that the legislative language above proves that the county commissioners expressly recognized the public health and safety impacts of storm water runoff and clearly specified the activities that the CWC would fund. We agree.

B. SECOND FACTOR

¶28 Storedahl next argues that the County failed to satisfy the second prong of the *Covell* test because the County does not use the CWC to regulate fee payers. "The second factor is whether the money collected must be allocated only to the authorized purpose." *Arborwood*, 151 Wn.2d at 372. "If the money must be allocated only to the authorized purpose, the charge is considered to be a fee." *Arborwood*, 151 Wn.2d at 372 (citing *Samis*, 143 Wn.2d at 809). But, "simply because charges are allocated to some 'broad category' of important services does not necessarily mean they are 'regulatory fees.'" *Samis*, 143 Wn.2d at 810.

¶29 Storedahl's argument fails because CCC 13.30A.100 requires the County to deposit service charges, interest, and penalties for delinquent payments and earnings thereon in a special fund in the county treasurer's office. The County can use the funds only for the cost and expense of regulating, monitoring, and evaluating storm water impacts; maintaining and operating storm water control facilities; educating the public on issues related to storm water; and all or any part of the cost and expense of planning, designing, establishing, acquiring, developing, constructing, and improving any such facilities. CCC 13-.30A.070 requires the County to place any excess funds into a capital facilities fund for acquiring and building new storm water facilities. Accordingly, we hold that, under the second *Covell* prong, the County's CWC more closely resembles a regulatory fee than a property tax.

## C. THIRD FACTOR

¶30 Lastly, Storedahl contends that the County failed to satisfy the third prong of the *Covell* test because the County does not use the CWC to fund the costs of regulating the fee payers and does not use the CWC to alleviate any burden the payers caused. "The third factor is whether there is a direct relationship between the fee charged and the service received by those who pay the fee or between the fee charged and the burden produced by the fee payer." *Arborwood*, 151 Wn.2d at 372-73. If there is no relationship, the charge is probably a tax. *Samis*, 143 Wn.2d at 811. But if such a direct relationship exists, this court can hold that the charge is a fee even though the charge is not individualized according to the benefit accruing to each fee payer or the burden the fee payer produced. *Arborwood*, 151 Wn.2d at 373. Further, if a direct relationship exists, only a practical basis for the rate is required, as opposed to mathematical precision. *Samis*, 143 Wn.2d at 811; *Teter*, 104 Wn.2d at 238.

¶31 Storedahl first contends that the additional activities benefit the general public, instead of the owners of the

charged properties. But the County correctly contends that the CWC provides a service to the fee payers by providing storm water facilities to accommodate their storm water runoff. In addition, the County asserts that it uses the CWC fee to alleviate the burdens the fee payers created by working to clean up water pollution and offset the detrimental impacts of storm water running off impervious surfaces in unincorporated Clark County.[4]

¶32 Storedahl contends that "street sweeping and mowing roadside ditches" benefit the public as a whole, rather than the actual fee payers. Br. of Appellant at 12. It also alleges that the County's use of CWC funds to revise, update, and amend the county development code and to hire more building inspectors does not relate to any service provided to the fee payers specifically. Finally, Storedahl asserts, "[C]attle grazing in riparian areas is entirely unrelated to impervious surfaces." Br. of Appellant at 18. But Storedahl misconstrues the overall plan of the CWC, which is to address existing storm water runoff conditions within the unincorporated areas of Clark County that constitute a potential hazard to the health, safety, and welfare of the lives and property of the inhabitants. CCC 13.30A.010. The County recognized that developed property with impervious surfaces significantly increased the volume and velocity of runoff and the amount of pollutants in storm water. Accordingly, it chose to charge those properties that were increasing the pollution—those with impervious surfaces.

---

[4] We note that several of Storedahl's claims pertaining to the third *Covell* prong relate to an "as applied" analysis of how this ordinance affects it directly. Br. of Resp't at 8. Specifically, Storedahl asserts, "Since storm water discharges from Storedahl's property are directly regulated by the state under Storedahl's own NPDES permit, the Storedahl property is not creating a burden being alleviated by the additional activities funded by the CWC." Br. of Appellant at 17. Storedahl also asserts that the County's efforts to reduce the effects of livestock on water quality does not directly relate to its facility. But where such a direct relationship exists, then the charge may be deemed a regulatory fee even though the charge is not individualized according to either the benefit accruing to each fee payer or the burden produced by each fee payer. *Covell*, 127 Wn.2d at 879. Accordingly, we will not engage in an "as applied" challenge. We also note that Storedahl does not ask us to use an "as applied" challenge.

We hold that the County's CWC more closely resembles a regulatory fee than a tax under the third *Covell* prong.

¶33 Division One of this court recently addressed a similar challenge. In *Tukwila School District No. 406 v. City of Tukwila*, 140 Wn. App. 735, 738, 167 P.3d 1167 (2007), the school district challenged the city's storm and surface water charge, also based on imperious surfaces. The city argued that its regulatory scheme had a direct relationship to both the services that property owners receive and the burden they create by increasing the rate and volume of surface and storm water runoff and pollutants. *Tukwila Sch. Dist.*, 140 Wn. App. at 742. The school district argued there was no direct relationship because the city did not base the fee on the cost of providing a targeted service but, rather, calculated it by dividing the annual revenues the city needed to construct the system by the estimated number of parcels in the city with impervious surfaces. *Tukwila Sch. Dist.*, 140 Wn. App. at 749. But the city charged the fee to real property owners with impervious surfaces on their land "because these surfaces require storm and surface water systems to alleviate the burdens their presence imposes on neighboring land." *Tukwila Sch. Dist.*, 140 Wn. App. at 749.

¶34 Division One recognized that "it rains everywhere and all parcels within the City benefit from a system that manages the quantity and quality of storm and surface water runoff to prevent flooding, erosion, sedimentation, pollution, and danger to life and property." *Tukwila Sch. Dist.*, 140 Wn. App. at 749. But "[w]hile there is certainly an overall public benefit, the fees assessed are still based on the amount and rate of runoff a parcel of property generates." *Tukwila Sch. Dist.*, 140 Wn. App. at 749-50. It then held that so long as the rate is reasonably based on the amount of the property owner's contribution to the problem, the fee is directly related to the service provided. *Tukwila Sch. Dist.*, 140 Wn. App. at 750. The *Tukwila* court held that the city satisfied the third *Covell* factor. *Tukwila Sch. Dist.*, 140 Wn. App. at 750.

¶35 Here, Clark County Ordinance 1999-11-09 provides the rate structure for the CWC. Specifically, the County bases the service charges on the relative contribution to increased surface and storm water runoff from developed parcels and based on the land use of the parcel. It imposes the service charge on all developed parcels within the unincorporated areas of the county with improvements having a value of $10,000 or more. It categorizes land uses as single-family residential lots; single-family residential large lots; multi-family residential lots; commercial, industrial, and other nonresidential lots; and undeveloped lots. It uses a base unit to calculate the service charge for each lot, which is 3,500 square feet of impervious surface area for single-family residential lots within the urban growth area of the county. Its annual service charge for each base unit of impervious surface area is $33. We recognize that, even under Division One's "reasonably based" test, Clark County's CWC more closely resembles a regulatory fee because Clark County reasonably based its rates on the amount of the property owner's contributions to the problem.

## II. GOVERNMENT ACCOUNTABILITY OFFICE DECISION

¶36 Storedahl contends that a recent decision by the United States Government Accountability Office (GAO) is dispositive it its favor. Specifically, it argues that, in the comptroller general's decision no. B-306666, the GAO found that a nearly identical King County charge based on activities it performs under its NPDES permit was a tax. But where the Washington State Supreme Court has already determined, in a particular context, the appropriate state constitutional analysis, it will not apply a different federal analysis under the United States Constitution. *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986); *State v. Reichenbach*, 153 Wn.2d 126, 101 P.3d 80 (2004). The County correctly argues that the GAO decision "sets forth a federal analysis of whether the King County storm water management fee is a tax for purposes of the federal immu-

nity from state taxation." Br. of Resp't at 43. Further, the GAO decision does not consider any issue of Washington constitutional law and does not apply the *Covell* analysis as our Supreme Court requires. Accordingly, the GAO decision provides no authority in deciding this case. We hold that the proper standard of review in Washington is under *Covell*.

¶37 Affirmed.

HUNT and QUINN-BRINTNALL, JJ., concur.

Review denied at 164 Wn.2d 1018 (2008).